**UNITED STATES of America, Plaintiff,**

v.

**WESTERN ELECTRIC COMPANY, INC., et al., Defendants.**

**Civ. A. No. 82–0192 (HHG).**

United States District Court,
District of Columbia.

July 25, 1991.

---

## OPINION

HAROLD H. GREENE, District Judge.

The issue before the Court in this, the most recent chapter of this antitrust case, is whether the Court should remove the restriction on information services imposed as part of the consent decree. Under a decision of the Court of Appeals, such removal is required if this Court is not able

to conclude from the evidence that the entry of the Regional Companies into the presently restricted market would be certain to lessen competition.

## I

### History

This lawsuit was brought by the Department of Justice on behalf of the United States against the American Telephone and Telegraph Company in November 1974. Following a period of discovery and of pretrial motions, an eleven-month trial began in January 1981. *See generally, United States v. American Tel. & Tel. Co.,* 552 F.Supp. 131 (D.D.C.1982), *affirmed sub nom. Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). Shortly before the taking of evidence was to be concluded, the parties agreed upon and submitted to the Court a proposed consent decree.

The Court held extensive Tunney Act[1] proceedings, in which all organizations, private and public (including twenty-nine States), with an interest in the decree were permitted to intervene and to participate. The Court approved the decree with some modifications on August 24, 1982, and entered it on that date as a final judgment. The Supreme Court affirmed that judgment on February 28, 1983.[2]

The seven Regional Companies,[3] which had inherited all the local telephone companies of the Bell System at the time the System's assets were split up, were subjected under the terms of the decree to several restrictions. These restrictions were based upon the kinds of anticompetitive activities that the local companies had engaged in while they were still a part of the Bell System, or were likely to engage in because the ability and the incentive therefor were present. As here relevant, one of the provisions of the decree prohibits the Regional Companies from providing interexchange and "information services,"[4] such services being defined as follows:

> "Information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information which may be conveyed via telecommunications, except that such service does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

552 F.Supp. at 229.

In 1987, in response to an initiative of the Department of Justice, the Court conducted a so-called triennial review of the continuing need for the restrictions imposed by the decree. At that time, again, the Court permitted wide participation in and intervention by interested parties, both private and governmental.

Following that review, the Court removed the restriction on the transmission of information, as well as a comprehensive catch-all restriction on the entry of the Regional Companies into non-telecommunications markets. However, the Court concluded that there was no basis for removing the three "core" restrictions—those on interexchange services, the generation of information, and the manufacture of equipment. *See generally, United States v. Western Electric Co.,* 673 F.Supp. 525 (D.D.C.1987).

---

1. Antitrust Procedures and Penalties Act, 88 Stat. 1706, 15 U.S.C. § 16(b)-(h).

2. The Supreme Court again summarily affirmed this Court's subsequent approval of the AT & T Plan of Reorganization which was drafted under the auspices of the decree. *United States v. Western Electric Co.,* 569 F.Supp. 1057 (D.D.C. 1983), *aff'd, California v. United States,* 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983).

3. From the very outset, this Court has eschewed alphabetical abbreviations which might be in-

comprehensible to those not directly involved in this litigation, and accordingly it has used the term Regional Companies rather than RBOCs, it has made reference to the decree rather than the MFJ, and the like. The Court will continue to avoid bureaucratic and technical terminology to the extent that it is possible to do so.

4. "After completion of the reorganization ... no BOC shall ... provide interexchange or information services...." Section II(D)(1) of the decree.

The basic rationale for keeping intact the core restrictions was that the Regional Companies retained their monopoly control of the local telephone switches and wires, with the consequence that competitors of these companies in the markets affected by the restrictions could reach their ultimate customers only at the Regional Companies' sufferance. These companies, reasoned the Court, were in the same position as their predecessor Bell System, which "could with ease discriminate against [competitors] by such practices as delaying interconnections, providing inferior connections, charging exorbitant prices, or refusing to attach competitors' products altogether. [The Regional Companies are] also able to subsidize [their] competitive products with funds syphoned off from the monies paid in by the ratepayers...." 673 F.Supp. at 600, 602.

The Regional Companies and several other parties, including the Department of Justice, took appeals. The Court of Appeals affirmed the decisions of this Court on several issues, but it reversed and remanded the issue of information services. *United States v. Western Electric Co.*, 900 F.2d 283 (D.C.Cir.), *cert. denied sub nom. MCI Communications Corp. v. United States*, — U.S. ——, 111 S.Ct. 283, 112 L.Ed.2d 238 (1990). The appellate tribunal held that, inasmuch as none of the original parties to the consent decree[5] is opposing the removal of the information services restriction, the appropriate provision of the decree to govern judicial decisions with respect thereto is section VII of that decree[6] (which, the appellate court said, establishes a public interest standard), rather than section VIII(C)[7] (which deals only with removals of restrictions contested by one of the original parties).[8] 900 F.2d at 295, 305–07.

The Court of Appeals went on to indicate that, in view of the expertise of the Department of Justice in enforcing the antitrust laws, this Court was to defer to that Department with respect to a number of issues.[9] Inasmuch as this Court had in several respects applied legal standards differing from those laid down in the Court of Appeals opinion, the case was remanded for further fact-finding with respect to the information services restriction under the criteria established by the appellate court.

Following the issuance of the appellate mandate, this Court once again entertained briefs from all the parties, including the intervenors which would be affected by the decision, and it heard oral argument during two successive days. In addition to their legal arguments, various parties and intervenors also submitted voluminous evidence in the form of affidavits and exhibits.[10]

---

**5.** The Department of Justice and AT & T were those original parties, but the Regional Companies which used to be integral parts of AT & T (or the Bell System as it is often referred to) were held to be in the same category.

**6.** Section VII of the decree states:

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Modification of Final Judgment, or, after the reorganization specified in section I, a BOC to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Modification of Final Judgment, for the modification of any of the provisions hereof, for the enforcement of compliance herewith, and for the punishment of any violation hereof.

552 F.Supp. at 231. This vesting of future jurisdiction in this Court was in the consent decree as drafted by the parties; the Court did not add it to the decree or alter it in any way.

**7.** Section VIII(C) provides:

The restrictions imposed upon the separated BOCs by virtue of section II(D) shall be removed upon a showing by the petitioning BOC that there is no substantial possibility that it could use its monopoly power to impede competition in the market it seeks to enter.

552 F.Supp. at 231. This section was drafted by the Court and its adoption as part of the decree was made a condition of the Court's approval. *See* 552 F.Supp. at 225.

**8.** The Court of Appeals also held that the Department of Justice may not petition for removal of a restriction under section VIII(C). 900 F.2d at 294.

**9.** These issues, and the precise language employed by the Court of Appeals with respect to this subject, are discussed in Part VII–A, *infra*.

**10.** MCI and the American Newspaper Publishers Association were the only affected parties sug-

These affidavits, exhibits, and arguments form the basis for the instant decision.

The Court will consider first the various aspects of the substantive issues [11] discussed by the parties to the proceeding.

## II

### Market Power

■ The Court of Appeals has stated that the exercise of market power is a necessary prerequisite to damage to competition under the antitrust laws, and that "unless the entering BOC will have the ability to raise prices or restrict output in the market it seeks to enter, there can be no substantial possibility that it could use its monopoly power to 'impede competition.'" 900 F.2d at 296. The issue is whether the Regional Companies possess market power within the meaning of that definition.

#### A. Market Power in General

The Regional Companies note that market power is deemed to exist when there are substantial barriers to entry, a large market share, and a paucity of substitutes, and they contend most notably that they presently lack any market share in the information services market and therefore could not possibly have market power. Moreover, according to the affidavits and exhibits submitted by these companies, they could not hereafter obtain significant market share in competition with the many large companies already in the market,[12] and they would be unable in practice to raise their competitors' costs (through either higher tariffs or degraded access to

the local exchange). Even if they could achieve such ends, the Regional Companies argue, they might at most be able to raise prices in the local exchange market, but not in the information services market—the critical area for antitrust analysis according to the Court of Appeals.

The most detailed evidence adduced by the Regional Companies on market power is an affidavit of Franklin Fisher, a professor of economics at the Massachusetts Institute of Technology.[13] According to Professor Fisher, the Regional Companies would be able to achieve market power only if (1) they had the ability to raise the costs of their rivals; (2) this ability gave them power over the price of information services; (3) regulators were unable to defeat this anticompetitive behavior; and (4) efficiency losses due to anticompetitive conduct by the Regional Companies outweighed the benefits to the public of the Regional Companies' presence in the market.[14] In this Part of this Opinion, the Court will examine only the first and second factors described by Professor Fisher; the third and fourth factors are discussed in Parts III and VI, respectively.

Professor Fisher asserts in amplification of his conclusions that the information services market is national in scope, and that this fact permits independent information services providers to move their operations to the territory of a Regional Company that does not discriminate against them.[15] Moreover, according to the Fisher affidavit, the Regional Companies will not be able to discriminate at the consumer end of the telephone circuits because of the difficulty

---

gesting that it would be useful to hold an evidentiary hearing, in addition to the written submissions of evidence. MCI's Response to United States Motion for a Briefing Schedule at 2; Reply of the American Newspaper Publishers Association at 3. The Department of Justice affirmatively stated that evidentiary hearings were in its view unnecessary and inappropriate. Reply of the United States at 2. The Court has concluded that it is able to make the findings required by the Court of Appeals on the basis of the affidavits and exhibits that have been filed.

11. The issues surrounding the Court of Appeals requirements regarding what may generically be called "burden of proof" questions are discussed in Part VII, *infra*.

12. *See, e.g.,* Hausman Affidavit at para. 12 (Exhibit to Regional Companies Motion).

13. Professor Fisher has a Ph.D. in economics from Harvard University; he has written extensively on the economics of antitrust law and regulation; and among his other achievements are the presidency of the Econometric Society and the receipt of a John Simon Guggenheim fellowship.

14. Fisher Affidavit at para. 6 (Exhibit 3 to Regional Companies Reply).

15. *Id.* at para. 13, 14.

of acting selectively there, and the only way they could have power over price would be through collusion among all of them, which would be difficult to achieve inasmuch as seven different companies are involved.[16] Professor Jerry A. Hausman similarly contends that discrimination by a Regional Company would be inconsistent with market data and economic theory, in substantial part because the Regional Companies will compete against each other.[17]

Other evidence submitted by the Regional Companies denies the existence of incentives to engage in anticompetitive acts. Thus, Dennis Carlton and George Stigler, both professors of economics at the University of Chicago, contend that the Regional Companies do not have an incentive to discriminate against competing information services providers because, if a competitor were driven out of business, the Regional Company would lose local exchange revenues from that competitor.[18]

As concerns the Department of Justice, it submitted *no* additional affidavits or other evidence on this or any other issue in the remand proceedings,[19] with the exception of an appendix summarizing current regulations of the Federal Communications Commission. It may be regarded as odd that, on a remand for the specific purpose of the compilation of an evidentiary record, the Department produced no evidence whatever.[20]

In the briefs it has filed in the current proceeding, the Department largely contents itself with supporting the arguments made by the Regional Companies.[21] But it is of more than academic or historical interest that, at the time of the adoption of the information services restriction, the Department postulated and persuaded the Court that the restriction was absolutely necessary, explaining as follows:

> The firms that provide information services must rely on access to local exchange facilities under the ownership and control of the [Regional Companies]. As commenters such as the American Newspaper Publishers Association and the Association of Telephone Answering Exchanges point out, *if the [Regional Companies] were permitted to offer information services they would have the power and the incentive to deter the*

---

**16.** *Id.* at para. 16, 26. Professor Fisher does not consider, however, that the existence of the joint research and development conducted by Bellcore on behalf of all the Regional Companies, in areas ranging from network architecture design to financial management, would greatly facilitate collusion. *See, e.g.,* Affidavit of Stanford University Professor Roger Noll at para. 53.

**17.** Hausman Affidavit at para. 16 (Exhibit 2 to Regional Companies Reply). Professor Hausman dismisses concerns about denials and delays in service, poor quality service, and delays in necessary repairs as "a familiar litany." *Id.* at para. 22. If Hausman is suggesting that, because these concerns are familiar they have no basis in reality, his reaction is like that of the French police inspector in the motion picture *Casablanca* who was "shocked—*shocked"* when he was told that gambling was going on in Humphrey Bogart's cafe. The litany may be familiar, but the facts behind it are nonetheless real. These facts were proved during the *AT & T* trial by many witnesses in testimony consuming many weeks. With respect to their control over the local exchange, the Regional Companies are of course now largely positioned as was AT & T before 1984.

**18.** Carlton and Stigler Affidavit at para. 40 (Exhibit 4 to Regional Companies Reply). Any

economic disadvantage due to the loss of exchange revenues from independent information providers would of course be more than made up through Regional Company assumption of all the business of, and the profits previously earned by, these providers.

**19.** This is so even though the Court had invited all the parties to structure their submissions in the manner of summary judgment motions.

**20.** The Department did make frequent reference to the report of its consultant Peter Huber which had been before this Court in the earlier triennial review decision.

**21.** However, the Department does not agree with these companies with regard to the issue of the relevant market. While Professor Hausman on behalf of the Regional Companies posits a broad information market which includes computer manufacturers, financial service companies, airlines, retailers, and the like (Hausman Affidavit at 4; Regional Companies Brief at 28–31), the Department states that "information services do not comprise a single market; they vary with respect to concentration, ease of entry, and dependence on local telephone facilities" (Brief for Appellant United States at 9–10 (Docket 87–5388) (filed April 17, 1989)).

*development of competitive markets for these services.* The Department, therefore, continues to believe that the [Regional Companies] must be precluded from engaging in such activities to ensure the development of competitive markets for information services.[22]

The Department now states that it had concluded by 1987 that no substantial possibility existed that the Regional Companies could use their monopoly power in local exchange markets to impede competition in information services markets. However, that conclusion rests essentially only on the proposition that, in view of the decree's nondiscrimination provisions and of the present regulatory regime, it would be virtually impossible for a Regional Company to discriminate on a widespread basis without detection and sanction.[23] The issue of regulation is discussed in Part III, *infra.* Suffice it to say at this point that regulation was also present, albeit in a somewhat different form, when the Department unambiguously and vigorously called for a prohibition on Regional Company participation in the information services market.

Regarding that aspect of its explanation which relies on the non-discrimination provisions of the decree, the Department notes that the degradation of calls to and from competing information service providers would be improper[24] under those provisions (as well as being difficult). The Department does not explain on what basis it may be assumed that, following the removal of the specific restriction on information services, the Court could reasonably convert the general antidiscrimination provisions of the decree into effective authority for restraining Regional Company anticompetitive action against independents with respect to information services, particularly since, on its face, those provisions prohibit only discrimination in favor of AT & T.[25]

## B. Market Power as a Consequence of Bottleneck Control

■ Market power is often the consequence of sheer size or financial strength; but as the intervenors[26] point out, in the instance of the Regional Companies, their market power stems not from either of these factors[27] but from their still almost complete domination over the "last mile" of the telephone network, *i.e.*, their monopoly of the local wires and switches without which few, if any, competitors can reach the ultimate consumers of telephone-based information services. In fact, around ninety-nine percent of the traffic to the ultimate subscriber must still pass, in the end,

---

22. Response of the United States to Public Comments on Proposed Modification of Final Judgment at 65 (filed May 20, 1982) (emphasis added).

23. Motion at 17. The Department also acknowledges that independent providers may lose profits or market share as a consequence of the Regional Companies' entry into the market, but it assumes that this would occur as a result of Regional Company "efficiency or innovation," Reply Brief at 27. Of course no one can know at this time whether the Regional Companies will be efficient and innovative in information services. The Department does not acknowledge that there exists at least the possibility that the companies will gain profits or market share as a result of other factors, *i.e.*, anticompetitive activities.

24. Motion at 17, 19–21.

25. Section II(B) of the decree, reprinted at 552 F.Supp. at 227, states:

B. No BOC shall discriminate between AT & T and its affiliates and their products and services and other persons and their products and services in the:
1. procurement of products and services;
2. establishment and dissemination of technical information and procurement and interconnection standards;
3. interconnection and use of the BOC's telecommunications service and facilities or in the charges for each element of service; and
4. provision of new services and the planning for and implementation of the construction or modification of facilities, used to provide exchange access and information access.

26. In order to avoid unnecessary complication, the Court will refer to the opponents of the point of view advocated by the Regional Companies as the intervenors, although several of the intervenors favor that point of view.

27. However, these factors may likewise be present here.

through the Regional Companies' local loops.[28]

■ This basic circumstance[29] gives these companies the ability to exercise market power[30] with respect to the information services markets, that is, to raise price, to restrict output, or both. The Regional Companies would be able to raise price by increasing their competitors' costs, and they could raise such costs by virtue of the dependence of their rivals' information services on local network access. As Professor Hall states, "[w]hen all but one firm in a market have higher costs, the inevitable result is a higher price, lower output, and lower consumer welfare."[31] Similarly, a Regional Company would be capable of discouraging entry by acquiring a reputation for strategic predatory pricing and denying its competitors post-entry profits,[32] and it would be able to do so credibly because it could shift the costs of its information services to its regulated operations.[33]

The Court is further of the view that, if relieved of the restriction, the Regional Companies would carry out these strategies because (1) this was the pattern of their operations when they were a part of the Bell System, and (2) even after the break-up of that System, they have been engaging in these practices to the extent that they have been permitted into markets that offered opportunities therefor. *See* Part IV, *infra.*

The evidence[34] also demonstrates that non-telephone-based services are not substitutes for the information transmitted over the telephone network, if only because the basic telecommunications network has distinct properties not available through other means: only the telecommunications network can offer two-way interaction with up-to-the-minute information databases accessible by a large customer base, including occasional users.[35] Clearly, telephone-based information services constitute a market that is separate from services delivered by other means.[36]

What is notable in the papers submitted on this issue by the Regional Companies is what is not discussed or discussed only to a limited extent. In view of the centrality of the intervenors' argument that the Regional Companies have market power because of their control of the bottlenecks,[37] it might have been expected that the propo-

---

**28.** Transcript of April 19, 1991 hearing at 41; *see also,* Affidavit of Robert Hall at 16 (Exhibit 1 to MCI Opposition); and 673 F.Supp. at 536–40.

**29.** It has long been established that essential facilities, that is, facilities which cannot feasibly be duplicated but which are critical to competitors, are a type of entry barrier. Whoever controls such an essential facility has the power to exclude competition, and such control indicates market or monopoly power. *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 377, 93 S.Ct. 1022, 1029, 35 L.Ed.2d 359 (1973); *United States v. Terminal R. Ass'n,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912); *Hecht v. Pro–Football, Inc.,* 570 F.2d 982, 992–93 (D.C.Cir. 1977).

**30.** For the reasons discussed in the body of this Part of the Opinion, the Court finds as a fact that the *ability* to exercise market power is fully present. The *incentive* to exercise such power may be deduced from the expectation of increased profits and the acquisition by Regional Company managers of the ability to direct increasingly diversified, increasingly powerful conglomerates. In fact, since they were established, the companies have made many efforts to enter markets in which their bottleneck monopolies give them an advantage over possible competitors. *See* Part IV, *infra.*

**31.** Hall Affidavit at 28 (Exhibit 1 to MCI Opposition).

**32.** *See, e.g.,* R. Posner, *Antitrust Law* 186 (1976).

**33.** Hall Affidavit at 4–5.

**34.** Affidavit of Walter Sinback at pp. 5–12 (Exhibit to Opposition of General Electric Communications & Services).

**35.** *See also,* Report of Peter Huber, submitted by the Department of Justice during the triennial review proceedings, at 6.23.

**36.** Another factor not present in the standard market analysis proffered by the Regional Companies is that the companies are seeking to enter the competitive information services market while they also retain their regulated local telephone operations—operations that can easily be used as cash cows from which they can milk money and then lower their own information services prices to deny profits to their competitors. The issues surrounding that circumstance are discussed in Part V, *infra.*

**37.** *See* note 29, *supra.*

nents of a removal of the information services restriction would first acknowledge the contention regarding that aspect of market power, and then attempt in some substantial way, by affidavits and otherwise, to answer it. Although half-hearted attempts are made to counter the intervenors' bottleneck point, recognition of the importance of the bottleneck issue is missing and so is a fully-developed, persuasive response.

The Regional Companies do assert that "[e]xperience since divestiture, both at home and abroad, has demonstrated that control over the local telephone exchange is not a means to acquire market power in information services." [38] But there has of course been no experience with information services, for the Regional Companies have been forbidden since their birth to engage in such services (except for the limited purpose of transmitting information generated by others). *See United States v. Western Electric Co.*, 714 F.Supp. 1, 5–7 (D.D.C. 1988).

The Court permitted the Regional Companies to establish elaborate facilities and processes for the transmission of information generated by others precisely because it concluded that the "potential for anticompetitive behavior by the Regional Companies with respect to transmission only is very much limited, if only because, in the absence of their participation in the generation or manipulation of content, these companies have little incentive for discrimination against competitors in the information market". 714 F.Supp. at 5.

The Regional Companies attempt to bolster their "experience" argument by asserting that if their bottleneck control were sufficient to produce market power, the result would have evidenced itself in the CPE (customer premises equipment) market and in the experience of the GTE Corporation.[39] However, as discussed at pp. 321–22, *infra*, neither the CPE experience nor that of GTE is relevant; they prove only that, where the ability or the incentive to discriminate is lacking, discrimination will not be practiced.

Beyond that, the Regional Companies assert that practical substitutes exist for their local lines and switches (a contention with which even the Justice Department disagrees, *see* note 45, *infra*). At the same time, the companies provide no response to the intervenors' contention that their bottlenecks enable them to discriminate with respect to features necessary for the transmission of information services (*see* Part IV, *infra*).

The Department of Justice concedes that "[i]f an information service is accessible to customers through the public telephone network, information service providers will depend to some extent on that BOC's local exchange facilities and services." [40] But the Department goes on to contend that this factor does not constitute an adequate basis for the maintenance of the restriction because this Court allegedly found that a discrimination strategy would be so risky that a Regional Company would not discriminate.[41] That reliance is surprising for, as the Department knows, the Court made the finding referred to in the context of Regional Company entry into miscellaneous *non-telecommunications* businesses.[42] These are of course markets with wholly different contours in which, as distinguished from the information services market, the Regional Company local monopoly could play only a minor role.

The Department of Justice and the Regional Companies next engage in a lengthy and passionate defense of vertical inte-

---

**38.** Motion at 21.

**39.** Motion at 21; Reply Brief at 74.

**40.** Justice Department Motion at 15. The Department of Justice differs from the Regional Companies on that issue, too, for unlike the companies, it concedes that various information services markets differ with respect to ease of entry, and that the independent information services providers could not, in practice, operate their own substitutes for the Regional Company bottlenecks.

**41.** Reply Brief at 33–35.

**42.** 673 F.Supp. at 599.

gration, suggesting that the restriction[43] herein is based on a pervasive hostility to vertical integration.[44] None of the Court's positions, either now or in the past, denigrated vertical integration, nor has the Department of Justice—the author of the restriction—demonstrated hostility to that concept.

During the trial of the antitrust action against it, AT & T argued, just as the Regional Companies do here and now, that the antitrust effort constituted an attack on vertical integration. It was AT & T's announced expectation that, as a challenge to vertical integration, the antitrust action would be dismissed. However, the Department of Justice explained in response that a fundamental difference exists between vertical integration may be both useful economically and protected by the law, on the one hand, and a combination in one enterprise of a rate-of-return monopoly and various competitive ventures, on the other. The Court fully endorsed that position. *United States v. American Tel. & Tel. Co.,* 524 F.Supp. 1336, 1373–74 (D.D.C.1981). The resuscitation of the argument ten years later by AT & T's heirs does not enhance its persuasiveness.

Finally, in answer to the intervenors' bottleneck argument, the Department recites such generalities as that independent information service providers might not even be connected to the local loops controlled by the Regional Companies—a point in effect refuted by the Department's own concessions elsewhere[45]—and that it is "aware of no evidence that the [Regional Companies] would act in concert in the provision of information services...."[46] The Department fails to explain how there could be such evidence at a time when the Regional Companies are prohibited from providing information services and have presumably complied with that prohibition.

On the basis of the considerations summarized above, the Court has no hesitancy in concluding that legal and economic theory which neglects, or accords little weight to, the bottleneck factor, is entirely unrealistic. The Court further holds, on the basis of the evidence before it that, by virtue of their indispensable and ubiquitous local wires and switches, the Regional Companies possess market power in the information services market.[47]

### III

### *Efficacy of Regulations*

#### A. General

Both the Regional Companies and the Department of Justice contend that regulation is a significant constraint on the ability of these companies to raise their information service rivals' costs and decrease output in the information services market. The basic undergirding for that argument is that the FCC's *Computer II* rules and *Computer III* Open Network Architecture (ONA) "require the BOCs to provide their information services competitors access to BOC exchange services at the same rates the BOCs' own information services pay."[48] That argument overlooks, however, that in the days prior to its break-up,

---

**43.** Although the arguments are couched in terms of the restriction on information services, their logical effect reaches the other decree restrictions as well.

**44.** Justice Department Reply Brief at 15–16, 27–28; Kahn Affidavit at 17–20; Carlton and Stigler Affidavit at 10–14 (Exhibits 1 and 4 to the Regional Companies Reply Brief).

**45.** The Department of Justice has conceded that the available alternatives to the Regional Company exchange facilities are not "close substitutes" for local exchange services for many providers, and that it therefore could not "conclude at this point that alternative transmission media would in themselves effectively constrain [Re-

gional Company] discrimination against most information service providers." Motion at 32–33.

**46.** Motion at 29.

**47.** Of course, unless and until they are allowed fully into the information services market, the companies as a general matter lack the incentive to exercise such power because they do not benefit from decreased profits for other information services providers nor can they achieve monopoly profits for their own information services. *See also,* note 30, *supra.*

**48.** Department of Justice Reply at 36; *see also,* Regional Companies Reply at 53–56.

the Bell System was under a comparable obligation by virtue of the then existing FCC regulations, but that these regulations were entirely incapable of halting anticompetitive activity.[49]

As the Court found when, as an alternative to the structural relief ultimately adopted, an injunction comparable to a regulatory regime was being considered:

It would be difficult to formulate an order that would effectively deal with all of the different kinds of anticompetitive behavior that are claimed to have occurred over a considerable period of time, in various geographical areas, and with respect to many subjects. There is evidence which suggests that AT & T's pattern during the last thirty years has been to shift from one anticompetitive activity to another, as various alternatives were foreclosed through the action of regulators or the courts or as a result of technological development....

An even more formidable obstacle is presented by the question of enforcement. Two former chiefs of the FCC's Common Carrier Bureau, the agency charged with regulating AT & T, testified that the Commission is not and never has been capable of effective enforcement of the laws governing AT & T's behavior. In their view, this inability was due to structural, budgetary, and financial deficiencies within the FCC as well as to the difficulty in obtaining information from AT & T. Whatever the true cause, it seems clear that the problems of supervision by a relatively poorly-financed, poorly-staffed government agency over a gigantic corporation with almost unlimited resources in funds and gifted personnel are no more likely to be

overcome in the future than they were in the past.

552 F.Supp. at 167–68 (footnotes omitted).

B. New Regulations

The suggestion is made in response that the present regulations under present conditions, involving seven corporations rather than one, will be more successful than was the pre–1984 regulatory regime. Although the current regulations include a number of new features, on balance they are, if anything, less likely to be effective than those that were supposed to constrain the Bell System. For what cannot be overemphasized is that, as the structure of a corporation becomes more complex and as it deals in more and more different products and services, it becomes increasingly difficult for regulation and regulators to oversee its operations and restrain anticompetitive efforts.[50]

The Regional Companies engage in a great many more non-telephone activities than did AT & T at any time in its existence. At least since the entry of the first consent decree in 1956 and until the resolution of the lawsuit underlying this proceeding in 1984, the Bell System was restricted to the provision of telephone service (through its Long Lines department and the local operating companies), the manufacture of telephone equipment (through Western Electric), and research (through Bell Laboratories). The Regional Companies, by contrast, are already engaged in activities too numerous to list or describe— from cellular phone service in the Soviet Union [51] to cable television in other countries, the making of loans to other corporations, the sale of software to banks and

---

49. *See* Noll Affidavit at para. 37 (Exhibit to American Newspaper Publishers Association Opposition). The Court rejects as completely in error the conclusion of Professor Alfred Kahn, one of the Regional Companies' economists, who minimizes the possibility of "regulatory capture," arguing that this notion is a mere "caricature" of the regulatory reality. Affidavit at 3 (Exhibit 1 to Regional Companies Reply). He states that "during the 1960s and 70s, the public utility regulatory commissions showed themselves ... excessively disposed ... to protect competitors from unfair disadvantage...."

*Id.* at 12. Having heard evidence at the eleven-month trial in this case, the Court finds that, at least in the telecommunications field, there is no basis whatever for Professor Kahn's conclusion.

50. *See* Affidavit of Glen Robinson, former FCC Commissioner, at 10–11 (Exhibit to Opposition of American Newspaper Publishers Association).

51. 11 *Communications Daily* No. 137, p. 4 (July 17, 1987).

hospitals, and the conduct of market research,[52] to name but a few. In fact, there appear to be no other utilities under regulation in the United States with anywhere near as many different facets and active business interests as the seven Regional Companies.

Because of the diversification of the companies—a characteristic that would be vastly amplified by a grant of their current request—regulation has become increasingly problematic, to the point where one state regulatory body has felt compelled to explore a new structural solution—the divestiture of NYNEX's local exchange operations from its competitive enterprises. *New York Times*, October 4, 1990 at A1, col. 5; *Wall Street Journal*, October 4, 1990 at A5, col. 1. In view of the broad plans and ambitions of the various Regional Companies, these complications would be bound to multiply and so would be the obstacles to effective regulation.

Open Network Architecture is supposed to unbundle the various features available over telephone lines, in theory providing independent information service providers with more complete information about network features and allowing them to pick and choose the specific features they need. The proposed *Computer III* rules also call for new regulations on cost accounting designed to render it more difficult for Regional Companies to subsidize their information services with revenue from their local exchange monopoly. *See* 3 FCC Record 1150 (1988); 2 FCC Record 1298 (1987).

However, one immediate problem with these rules is that they have little or no track record from which a court could reach a conclusion as to their efficacy.

The Court of Appeals for the Ninth Circuit vacated the *Computer III* rules last year, *California v. FCC*, 905 F.2d 1217 (9th Cir. 1990), an action that had the effect of also vacating the ONA regime. The FCC did reinstate ONA in December of 1990, 1990 FCC LEXIS 6662, and last month it established a tariff structure.[53] However, the Regional Companies are not required to file new tariffs for these services until November 1991.[54] In short, ONA is still developing and evolving, and its success in enabling competitors in the information services market to obtain the features they need is entirely unproven. Thus, with respect to regulation, the situation is not significantly different from what it was last year when the Court of Appeals concluded that any assessment of the new FCC regulatory regime was too speculative. 900 F.2d at 298.[55]

## C. Inherent Problems

Beyond the naturally still isolated examples of anticompetitive conduct discussed below, there is the overriding fact, which experience has validated again and again, that as a practical matter it appears to be impossible for regulators to devise simple rules to govern the many economic, technical, and financial circumstances affecting behavior in an area that is characterized by technological change perhaps more than by any other factor.

Yet unless the rules are quite simple and straightforward, the Regional Companies will be able to contend, again and again, that any particular rule is not applicable to whatever anticompetitive practices they may be engaged in, and to tie up enforcement almost indefinitely in administrative

---

52. Force, "U S West Scales Back Leasing; Finance Subsidiary Plots Course as Merchant Bank," *American Banker* 6 (November 15, 1988); Layne, "Nynex Builds Software Role With Agreement to Buy SSI," *American Banker* 3 (July 20, 1990); "Bell Atlantic To Acquire Simborg Systems," *Modern Healthcare* 19 (June 25, 1990); Powers, "Nynex Nabs Presence in U.S. High-tech Research," *Network World* 9 (April 18, 1988).

53. 11 *Communications Daily* No. 115, p. 3 (June 14, 1991).

54. *Id.*

55. As for those ONA rules that have been in place over the last several years, they have already provided some indication of their lack of effectiveness: they have not prevented the Regional Companies from discriminating against their competitors in the few markets in which such discrimination was at all feasible. *See* Part IV, *infra.*

proceedings and in litigation. This is not a mere theoretical concern. The evidence at the *AT & T* trial proved that it is possible to engage in endless dilatory maneuvers to preserve freedom of anticompetitive action even when the rules are relatively straightforward. And the voluminous files of this Court bear mute witness to the propensity of the Regional Companies to repeat claims and defenses, many of them frivolous, based on asserted distinctions from settled rulings.

As Professor Roger Noll of Stanford [56] points out in his affidavit (at pp. 32–33):

Information services provide an especially poor candidate for BOC entry because of the complexity and diversity of the industry. Almost every supplier is likely to try to produce a unique information product—just as word processors, statistical packages, data base services, reference services, and home shopping services are all somewhat different. This diversity, driven by differences among consumers in the kinds of services they most desire, makes discriminatory practices, strategic cost accounting among services, and unwarranted self-dealing financially attractive to a BOC, but especially difficult to prevent, or even to detect. To the extent local telephone companies have *any* discretion in selecting cost allocation methods, in varying service quality among information service providers, or in biasing the technology of local networks in favor of their own information services, they are certain to do so for two reasons. One is

the absolute certainty that some such strategies will succeed. The other is that such strategies, even if detected, will provide an interim period of excess profits because they impose handicaps on rivals and raise entry costs in the form of litigation to induce regulators and courts to overturn the offending practices.

The Court is convinced by the Noll analysis; indeed, it regards conclusions based on the facts which underlie that analysis as well-nigh irrefutable.

Experience has amply shown that regulatory enforcement proceedings often take years to complete and that, even then, the decisions that emerge are by and large only prospective in application. For example, a tariff becomes effective immediately upon its filing by a Regional Company, and absent unusual circumstances and special action, it remains in that status until all FCC proceedings have been completed (and possibly court reviews as well).[57] It was for that reason, among others, that the Department of Justice in 1982 sought structural relief in its proposed consent decree. While the Court is reluctant to cite to the AT & T experience (*see* Part VII–C, *infra*), it cannot help but observe that with respect to the efficacy of regulations to rein in a determined telecommunications monopolist, the situation is today essentially what it was before the divestiture, and that, to the limited extent that there has been any change, it has been, on balance, toward a diminution in the effectiveness of regulation.[58]

---

**56.** Among his other achievements, Professor Noll is currently supervisory editor of *Information Economics and Policy,* the journal of the International Telecommunications Society, he participated in the President's Task Force on Telecommunications Policy, and he consulted for the Department of Justice by way of developing market definitions for use in the *AT & T* case, and for the Federal Communications Commission as a special adviser to the chairman.

**57.** The Regional Companies are almost never penalized for engaging in anticompetitive behavior even if ultimately they lose before the regulators. *See* Affidavit of Nina Cornell at 30 (Exhibit 2 to MCI Opposition). In voice messaging, for example, BellSouth delayed making available to its competitors a special feature

until it was ready to compete in the market. *Id.* at 14–15. BellSouth also provided a call forwarding feature to its competitors under a tariff which raised these competitors' costs by as much as 900%. Cornell Affidavit at 12. The company withdrew the tariff from operation in Florida, but that same tariff is still in effect in other states. *Id.* at 12.

**58.** To be sure, unlike its most recent predecessors, the current Federal Communications Commission does not appear to be viscerally opposed to the very regulation it is charged with administering. However, the problems with regulation in the telecommunications market are primarily the systemic ones described above; they do not depend, except at the mar-

## D. Justice Department Contentions

In an area where the pre-divestiture record unambiguously proves that regulation could not restrain the monopolists' anticompetitive activities, and where no substantial record has been developed since that time, the Department of Justice advances a group of contentions that singularly lack merit. The Department contends, first, that there is no basis for concluding that the Regional Companies will not, for the most part, conform their activities to the FCC's rules (Reply Brief at 37–38); second, that the FCC has received no complaints with respect to the information services authorized by the March 1988 decree modification (Reply Brief at 38); and third, that while the FCC received other complaints regarding Regional Company anticompetitive conduct, they should be ignored for a variety of reasons (Reply Brief at 43).

As concerns the first and second points, they have no substance because the only activities in which the Regional Companies were allowed to engage since they became independent entities in 1984 were of the type with respect to which this Court had expressly concluded that they would provide no realistic opportunity for anticompetitive conduct.[59]

Primarily relied upon by the Department is the Regional Company experience with CPE.[60] But that product does not present a valid analogy in the present context because the Regional Companies are only allowed to sell CPE, not to manufacture it. It was precisely because the manufacture of the product would have given them the ability to engage in anticompetitive activities, while the sale of CPE manufactured by others would not, that the Court eliminated from the proposed consent decree the prohibition on the latter but not on the former. As the Court said at the time:

The proposed decree would also prohibit the Operating Companies from selling or leasing customer premises equipment. . . .

Anticompetitive activities undertaken by two separate corporations rather than by two components of the same corporation are likely to be far more difficult to accomplish because of increased problems of coordination and the greater possibility of detection. For example, it would be quite difficult for an Operating Company to conspire successfully with a manufacturer to provide advance information about revised network standards or to impose interconnection restrictions which favored that manufacturer's products and no one else's.

552 F.Supp. at 191 (footnotes omitted).

As indicated, the Regional Companies also refer to the experience of GTE which, it is said, has not discriminated in spite of the fact that it is not bound by line of business restrictions.[61] However, when the Court, at the request of the Department of Justice, permitted GTE to engage in interexchange and information services, it did so on the basis that the company would not have the ability to engage in anticompetitive actions with regard to these services, largely because of its dispersed geographical base. *United States v. GTE Corp.*, 603 F.Supp. 730, 734 (D.D.C. 1984).

In the Court's view, no valid conclusion can be drawn from Regional Company non-

---

gin, on the abilities and good intentions of the regulators. In the 1960s and 1970s, the FCC appears to have been committed to making regulation work, but as the *AT & T* trial record shows, the Commission was incapable of neutralizing the Bell System's anticompetitive activities.

**59.** If the Department's belief in the Regional Companies' good intentions is intended to extend also to the record of the companies when they were still a part of the Bell System, it is of course contradicted by almost every paper the Department filed in the *AT & T* case.

**60.** The affidavit of Professor Franklin Fisher cites, in addition to CPE, experience with the Yellow Pages, voice messaging, videotex, pay phones, cellular phones, and PBX, contending that in none of these have the Regional Companies attained market power. The reasons cited above for concluding that the Regional Companies lack the ability to engage in anticompetitive activities with respect to CPE apply to these other products and services as well.

**61.** Regional Companies Reply at 37–38.

discrimination in a market that provides no opportunity for discrimination. To put it another way, it is difficult to understand by what process of reasoning a finding of future lawful conduct with respect to activities providing ample opportunities for discrimination can be drawn from past experience with respect to activities which offer no such opportunities.

As for the Department's third argument, it, too, is specious. Essentially the Department states that when the FCC finds complaints of improper Regional Company activity to be well taken and acts upon them, this is proof that regulation is effective; when the FCC rejects particular complaints, this demonstrates that the complaints have no merit; and when the complaints are still pending administratively, it should be assumed that they will be resolved appropriately.[62] However, the regulations cannot be pronounced effective merely because the FCC dealt, somehow, with a minute number of complaints, nor does rejection of complaints prove their lack of worth or their pendency support the assumption that, some day, they will be properly resolved. The sad history of regulation in this field proves at least that much.

More fundamentally, had the Department suggested so circular an approach around 1980, it would have been unnecessary to hold the *AT & T* trial, for whatever the evidence, the Bell System would have prevailed on that kind of rationale. But the Department did not make that argument then—indeed, it would have greeted such an argument, if made by AT & T, with scorn and ridicule—and the Court will not credit that argument now.

Finally, both the Department and the Regional Companies contend that, in any event, should regulation fail, the antitrust laws themselves would provide a significant deterrent to Regional Company anticompetitive conduct.[63] The Court does not consider it a valid basis for dissolving a significant part of a prophylactic antitrust decree that a new antitrust suit could some

day be brought, presumably to result after years of litigation in a new decree, which would then again be dissolved upon hopes or professions of good behavior, and so on *ad infinitum.*

### E. State Regulation

State regulation is also likely to be ineffective in the current context. State regulators, who in the main must perforce operate with meager resources, but who are nevertheless responsible for the regulation of the bulk of Regional Company services, have consistently been unable, despite the best efforts of some, to exercise control over the vast and powerful Regional Companies. One basic reason for this impotence, in addition to the paucity of resources, is the fact that each of the Regional Companies operates in several states, and all of them are thus effectively beyond the jurisdiction of any single local regulatory body. Indeed, some of these companies, *e.g.*, US West, have refused to turn over to state regulators their records pertaining to operations within the region but outside of the particular state. *See* 673 F.Supp. at 569 n. 198. Beyond that, if federal regulators are not able to prevent anticompetitive conduct by the financially mighty and politically influential Regional Companies—in many areas the most powerful private entities extant—one would have to be an incurable optimist to suppose that state regulators could do so.

For these reasons, it is the finding of the Court, based on the evidence before it, that neither FCC nor state regulation can be expected to prevent anticompetitive activities by the Regional Companies.

## IV

### *Anticompetitive Conduct By Regional Companies*

Where the Regional Companies have been permitted to engage in activities because it appeared to the Court that the likelihood of anticompetitive conduct was

---

**62.** Reply Brief at 43.

**63.** Department Reply Brief at 43–44; Regional Companies Reply Brief at 61–62.

small, they have nevertheless already managed to engage in such conduct, albeit necessarily on a limited scale.

The affidavits submitted by some of the intervenors report that in the voice messaging market the Regional Companies have designed technical features in such a way as to render them incompatible with competitors' standard equipment; [64] priced the features in such a manner as to raise their rivals' costs; [65] made important and necessary features available only to their own affiliates; [66] and delayed implementation of features requested by competitors until the particular Regional Company was ready to enter the market.[67] At least two Regional Companies charge more to the customers of their competitors for needed features than they charge their own customers,[68] and this, too, has had the effect of raising these competitors' costs. To add insult to injury, some Regional Companies use as a selling point with customers the unavailability of the features they are withholding from competitors.[69]

Significantly, some of this anticompetitive conduct is made possible by the Regional Companies' requirement that, to receive service, independent information providers must submit detailed technical and marketing information to Regional Company personnel who can then use these data to decide whether and when their company will provide competing services.[70]

Similarly, in the payphone market, the lines the Regional Companies provide to their competitors are inferior in critical respects to the lines they use themselves.[71] In the audiotex market, independent providers report that the Regional Companies are delaying the servicing of their lines and are rendering the servicing and billing as inconvenient for them as possible; [72] and, just as the Bell System denied FX (foreign exchange) and CCSA (common control switching arrangement) connections to MCI,[73] Regional Companies are now denying to their competitors interconnections comparable to those that the Regional Companies themselves enjoy.[74]

In response, the Regional Companies explain that complaints about the alleged anticompetitive actions in the voice messaging market were either not specific enough to be investigated [75] or were resolved through regulatory commissions.[76] The Regional Companies further claim that they now provide enhanced features on an equal basis pursuant to tariffed rates,[77]

**64.** Affidavit of Nina Cornell at 10; Affidavit of Richard Press at 2–3; Affidavit of Frank Brooks at 6–7 (Exhibits 2, 9, and 6 to MCI Opposition).

**65.** Cornell Affidavit at 11–12; Hall Affidavit at 31–32 (Exhibit 1 to MCI Opposition); Brooks Affidavit at 3, 6. As indicated above, note 57, in one state, access tariffs were raised by over nine hundred percent.

**66.** Cornell Affidavit at 7–8; Affidavit of Rubie Czerwinski at 1–4 (Exhibit 7 to MCI Opposition); Brooks Affidavit at 2–3, 5, 7.

**67.** Cornell Affidavit at 7–8. Ms. Cornell identifies the "Call Forwarding Busy Line" and "Call Forwarding Don't Answer" features as among those that the Regional Companies had the technology to implement in 1985, but failed to implement until 1988, when they were first allowed in the voice messaging market. *See* Brooks Affidavit at 2–3; Czerwinski Affidavit at 2–3; Affidavit of Michael Hydock at 2–4 (Exhibit 4 to MCI Opposition).

**68.** Czerwinski Affidavit at 3–4; Press Affidavit at 1.

**69.** Brooks Affidavit at 8.

**70.** Cornell Affidavit at 33–34; Hall Affidavit at 42–43.

**71.** Cornell Affidavit at 17.

**72.** Affidavit of Dale Larson at 8–10 (conduct of U S West); Affidavit of Karen Stabley at 5–6 (conduct of Bell Atlantic) (Exhibits to American Newspaper Publishers Association Opposition).

**73.** This was an important item of proof in the *AT & T* trial. 524 F.Supp. at 1355.

**74.** Cornell Affidavit at 22.

**75.** *See* Exhibit No. 13 to Regional Companies Reply Affidavit Response No. 31.

**76.** *Id.* at Response No. 27.

**77.** *Id.* at Response No. 25, 32. As for the failure to make enhanced features available until the Regional Companies themselves were able to enter the market, the answer given is that Southwestern Bell provided these features through a special arrangement until there was enough demand to warrant the filing of a tariff.

and that they have ceased the anticompetitive activity.[78] The companies also describe the anticompetitive actions in the audiotex market as isolated incidents of customer service problems, and they contend that there was no intent to "inconvenience" the information service provider.[79] As for payphones, the Regional Companies explain that the problems have been settled through state regulators[80] or are currently being considered by regulators and the courts.[81]

It is surprising that the Regional Companies have succeeded in engaging in any anticompetitive conduct because until now they have been permitted to operate only in severely limited markets with respect to which such conduct appeared to be unlikely. But certainly the incidents that have thus far been brought to light—at a time when the Regional Companies knew full well that the Court was present and prepared to take action with respect to the still existing information services restriction— buttress the conclusion that to remove the restriction on the vast and complex information services field would be to court a significant risk of anticompetitive activities on a substantial scale, with equally substantial injury to competition.

## V

### Cross–Subsidization

The Regional Companies claim that they will not be able to force competitors out of the information services market through cross-subsidization and predatory pricing; that anticompetitive behavior would be detected and prosecuted by regulators; and that their potential competitors in the market are other large corporations with substantial resources which could withstand a predatory pricing strategy.[82]

There can be no question but that, due to the limited effectiveness of regulation (as discussed in Part III, *supra*), it would not be difficult for a Regional Company which is so inclined to divert ratepayer funds to its competitive enterprises, including its information services activities. The consequence of such diversion would be to enable the company to undersell its independent rivals in the information services market long and effectively enough to drive them from the market.

The Department of Justice argues, citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), that such a scheme would not be successful, for the predator could not keep incurring losses for a sufficiently long period to drive out competitors and to keep them out. It is certainly true that, as the *Matsushita* Court stated, such schemes "are rarely tried, and even more rarely successful." *Id.* at 589, 106 S.Ct. at 1357. That broad rule surely applies in most situations where one enterprise seeks to eject another from a particular market by predatory pricing.

One of the prerequisites to a strategy of predatory pricing is that the predator must have the "financial staying power" to outlast its competitors. Areeda & Turner, "Predatory Pricing and Related Practices Under Section 2 of the Sherman Act," 88 *Harv.L.Rev.* 697, 698–99 (1975). But as the Department of Justice recognized in 1981, a regulated monopoly whose revenues are determined through rate of return regulation has "almost limitless staying power." Government's Opposition to Defendants' Motion to Dismiss at 206 note * (filed August 16, 1981).

Staying power is certainly present in a situation such as that involved here, where a Regional Company, engaged in both competitive and noncompetitive markets, has the ability to make up for losses in the competitive arena indefinitely, or certainly as long as necessary. All it takes to achieve that objective is the ability to transfer funds to the information services enterprise from the noncompetitive local operations accounts that are periodically replenished by the ratepayers.

---

78. *Id.* at Response No. 24, 33.

79. *Id.* at Response No. 20.

80. *Id.* at Response No. 44.

81. *Id.* at Responses 45, 46.

82. Hausman Affidavit at 6–7 (Exhibit to Regional Companies Motion); Affidavit of Sanford Grossman at 3 (Exhibit 7 to Regional Companies Reply).

Here again, the Department of Justice previously understood and championed this reasoning. *See* Government's Opposition to Defendants' Motion to Dismiss (in the *AT & T* case) at 206 (filed August 16, 1981), where the Department said that "[u]nlike an unregulated firm, which must forego current profits to engage in below cost pricing, AT & T is subject to an overall earnings ceiling. It therefore has the ability, virtually indefinitely, to subsidize the prices of its competitive services with earnings from services in which it faces little or no competition—without sacrificing current profits." If the term "AT & T" is replaced by "a Regional Company," the quotation quite snugly fits the present situation.[83]

The only obstacle to such subsidization that has been suggested is that of regulatory oversight, that is, that the state regulators will not permit the Regional Companies to engage in such activities.[84] But as discussed in Part III-E, *supra,* the barriers to effective state regulation are so fundamental and pervasive that such regulation cannot be depended upon to stand in the way of strategic entry deterrence by the Regional Companies (any more than regulation was capable to standing in the way of similar activities by the Bell System).[85]

## VI

### *Consequences of a Removal of the Restriction*

A. Decrease in Competition

According to the Regional Companies and the Department of Justice, far from

revealing that removal of the information services restriction would be likely to lessen competition, the record demonstrates that such removal would increase competition in the relevant markets. The claim is that upon removal of the restriction, the Regional Companies would be able to provide new and better services, including additional features in gateways, information content, and other features of benefit to a variety of businesses.[86] Further, it is said, such removal would provide an increased incentive for Regional Company innovation in network services that would benefit not only these companies but also non-Regional Company information providers. And in a similar vein it is contended that the availability and technological sophistication of information services for small businesses and residential customers—which allegedly are lagging behind those of other countries—would vastly improve if the Regional Companies were permitted into the market.[87]

Under the Court of Appeals mandate, some of these considerations may be regarded as irrelevant, because "the 'public interest' test must take its meaning [only] from the antitrust laws." 900 F.2d at 308. However, to the extent that it is not entirely clear whether the points made are properly within or without the antitrust rubric,[88] the Court has considered them and has concluded that they are in error.

In the first place, the contention that it will take the Regional Companies to provide better information services to the

---

83. The FCC plan to replace overall earnings ceilings with price caps has not yet been fully implemented. Even when it is, the Department's former cross-subsidization analysis will still apply.

84. The Department of Justice professes not to know whether cost shifting opportunities will raise or lower prices in an information services market. Department Reply Brief at 64. But it is perfectly obvious that, while such strategies will in the short run lower price—as, for example, also does "dumping" by foreign firms—in the long run they permit the extraction of much higher prices and profits following the elimination of competitors from the market.

85. *See* Hall Affidavit at 4–5, 9–10.

86. Regional Companies Reply Brief at 31; Hausman Reply Affidavit at 27–28. Additionally, it is claimed that losses due to anticompetitive behavior by the Regional Companies will be outweighed by the benefits to the public from the Regional Companies' presence in the market. Fisher Affidavit at 6, 19–20.

87. Department of Justice Reply Brief at 21–25.

88. Some factors have been determined by the Court of Appeals as being plainly without that rubric (*e.g.,* the welfare of local ratepayers) and others are clearly appropriate antitrust considerations (*e.g.,* the power to raise price). With respect to still other subjects (*e.g.,* provision of better services and other benefits to the public) the answer is not certain.

American public can only be described as preposterous. The Regional Companies have no experience in the content or substance of information, whether it be news, financial information, compilations of materials of various kinds, or the provision of interactive services, and neither had the Bell System when the local telephone companies still operated under its umbrella. To be sure, the Regional Companies have experience in the transmission and dissemination of information, but they have been permitted to be active in that market since the Court so ruled in 1988.

In any event, far more probable than the realization of the Regional Companies' claims is the possibility that, once they are allowed to enter the information services market, many of those who now provide such services and which currently make the market so "robust and rapidly expanding" [89] will be driven out of business by the anticompetitive strategies which, on the basis of past experience, the Regional Companies will likely adopt. As a consequence, competition in the market will suffer or be extinguished.[90]

Moreover, the Court considers the claim that the Regional Companies' entry into information services would usher in an era of sophisticated information services available to all as so much hype. Experience suggests that once these companies have achieved the removal of the information services restriction, ample reasons will be found and cited why the more expensive promises could not be fulfilled.[91]

In the opinion of this Court, informed by over twelve years of experience with evidence in the telecommunications field, the most probable consequences of such entry by the Regional Companies into the sensitive information services market will be the elimination of competition from that market and the concentration of the sources of information of the American people in just a few dominant, collaborative [92] conglomerates, with the captive local telephone monopolies as their base. Such a development would be inimical to the objective of a competitive market, the purposes of the antitrust laws, and the economic wellbeing of the American people.

## B. Comparison With Foreign Information Systems

The Regional Companies also complain that the information services restriction has resulted in the United States falling behind other countries in the provision of

---

**89.** Regional Companies Reply Brief at 2.

**90.** After the independents have been eliminated from the market, the American consumer is likely to be faced with sharply reduced choices in information services: the Regional Companies will have no incentive to inaugurate new or innovative services (just as their predecessor AT & T had no incentive to provide and was slow in providing new services and products when it had monopoly control over the local exchanges and was thereby enabled to keep out competitors in long distance and manufacturing). This problem will in the present instance be exacerbated by the fact that because information services are expensive to develop and relatively cheap to disseminate, the Regional Companies will have little incentive to develop new services once competitors have been forced out of the market. Noll Affidavit at 14.

**91.** Some of the Regional Companies have been quite ready since the beginning of the decree construction and waiver process to make claims that were repudiated as soon as they had served their purposes.

For example, in response to this Court's September 10, 1987 opinion on information servic-

es, the assertion was made that all the companies needed in order to facilitate the provision to the American people of the most advanced information services was a relaxation of the restriction on the transmission of such services. *See, e.g.,* Proposed Order and Explanatory Memorandum of U S West filed October 15, 1987. However, immediately upon the achievement of that goal, a drumbeat of arguments was heard that there was also an absolute necessity for the companies' entry into information content. The claim was made and endlessly repeated that, unless they were also permitted to generate information, they had not received all that was their due, and the American public was being shortchanged with respect to information services. The prediction made now that the entry of the Regional Companies into information services will yield vast benefits to the American public must be evaluated in the light of that experience and others of a similar nature.

**92.** Bellcore, the joint Regional Company research arm, will be a ready vehicle for achieving joint control of the information services market.

information services. In this regard they point particularly to the French Minitel system with its inexpensive monitors in several million homes and businesses [93] as pointing to the path that should be followed here. However, the fact is that in France the state-owned company which transmits the information does not also generate it; its sole function is transmission. The French system should thus be seen as a videotex gateway system paralleling the system the Regional Companies have been permitted to provide since 1988; it is not an enterprise that generates the information that it transmits.

If the Regional Companies were permitted both to generate information and to transmit it, they would, certainly as of now, appear to be the only entities in the developed world to have this kind of a stranglehold on information. The present era is increasingly being described, with considerable accuracy, as an Information Age, with information more and more a central feature of the economy.[94] That being the case, it would hardly make sense or be in the public interest to cancel an important part of an antitrust decree forged after several decades of on-and-off litigation, and turn a key ingredient of the emerging information society over to corporations who not so long ago were involved in major violations of the antitrust laws, and who even now seem ready to engage in anticompetitive practices whenever the opportunity therefor presents itself. Indeed, it would be difficult to conceive of a step that would be less in the public interest.

## VII
### Ruling in Accordance With Appellate Mandate

For the reasons stated in Parts I through VI above, were the Court free to exercise its own judgment, it would conclude without hesitation that removal of the information services restriction is incompatible with the decree and the public interest. However, as will now be explained, the Court is not free to exercise its own judgment. Indeed, it has concluded that several rulings of the Court of Appeals in its 1990 opinion, as detailed *infra*, leave it no choice but to remove the restriction. Regardless of its own views of the law and the facts, this District Court, like all trial courts, is of course bound to follow and implement directions from appellate tribunals.[95] And the Court has concluded that, if it is to be faithful to the directions of the Court of Appeals, it must grant the Regional Companies' motion. It will accordingly do so, albeit with considerable reluctance.

Under the appellate mandate, the "burden of proof" issues are of decisive importance. It is telling in that respect that both the Department of Justice and the Regional Companies have concentrated in their written and oral submissions to this Court upon these issues, as distinguished from substantive ones. *See, e.g.,* the Regional Companies Reply Memorandum which begins as follows: "The central issue raised in intervenors' brief is one already settled by the Court of Appeals: the standard of review. Intervenors ask this Court to second-guess the Justice Department's policy judgment that removal of the information services restriction is now in order." [96] As will be

93. *See* Hausman Affidavit at 97–98 (Exhibit to Regional Companies Motion). The monitors were furnished to consumers free of charge by the government-owned telephone company.

94. This appears also to be true of such aspects of national life, to a greater or lesser degree, as entertainment, politics, and national defense.

95. In addition to its legal duty to follow that course, this judge is also mindful of the several district judges in various Southern states who, in the years following *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873

(1954), and other Supreme Court and Court of Appeals rulings on civil rights issues, stubbornly refused to follow these rulings. These were entirely inappropriate courses of action, and this judge has no desire to emulate them.

96. Regional Companies Reply at 1. The same theme is repeated again and again. *See, e.g.,* Reply Brief at 3 ("In light of the complex, multi-factored, judgmental character of the Department's policy determination, and the impressive array of support that determination has received, no one could reasonably conclude that

seen below, in view of the language of the appellate opinion, that assessment is not inaccurate.

The particular appellate rulings which, in the opinion of this Court, leave it no choice other than to remove the restriction, are as follows. First, rather than to leave the Court free to weigh the evidence and the law proffered by all the parties, preferring one over the other only on the basis of credibility, logic, consistency with known facts, and similar qualitative factors, the appellate decision requires the Court to accord special weight and deference to the views of the Department of Justice. Second, rather than to permit the Court to make its decision on the antitrust issues by the standard of probability of outcomes, the appellate decision requires the Court to remove the information services restriction unless there is certainty that entry of the Regional Companies into the information services market will lead to anticompetitive conduct by these companies. Third, rather than to allow the Court to consider substantially the actual performance of the local telephone companies when they were still part of the Bell System, the appellate decision requires the Court to accord primary weight to the necessarily theoretical present-day forecasts of economists. Each of these factors will now be explained in somewhat more detail.

## A. Deference to Department of Justice

■ The Court of Appeals has ruled that this Court must approve the proposed lifting of the information services restriction if the proposal satisfies the "public interest" standard of the Tunney Act. 900 F.2d at 295. Among the significant provisions

of that Act is section 16(e) of title 15 of the United States Code, which directs that proposed antitrust consent decrees in government cases may not become effective unless they are approved by the court having jurisdiction of the underlying lawsuit. Indeed, it is plain from the statute and its legislative history that a court, rather than being a "rubber stamp" for the Department of Justice, is required to act as an independent check on the terms of such decrees. *United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131, 148–49 (D.D.C. 1982); *see United States v. American Cyanamid Co.*, 719 F.2d 558, 565 (2d Cir. 1983).

The legislative history of the statute shows that the Congress was disturbed that antitrust consent decrees had sometimes failed to provide appropriate relief, either because of miscalculations by the Department of Justice or because of the "great influence and economic power" wielded with respect to that department by antitrust violators.[97] That history, moreover, is replete with examples of Justice Department support of companies with great economic as well as political power. Congress took particular note in this regard of the history of the ITT consent decree which was negotiated under questionable conditions,[98] and of the 1953 phase of the AT & T litigation, in which the then Attorney General settled the case under dubious circumstances on the basis of "token" measures agreed to following private discussions.[99] It was to deal with such problems that Congress directed that antitrust settlements arrived at between the Department of Justice and private corporations were not to become effective unless

---

removal of the information services restriction is 'certain to lessen competition,' ").

**97.** *See, e.g.,* S.Rep. No. 93–298, 93rd Cong., 1st Sess. 5 (1973); 120 Cong.Rec. 36341 (1974). Senator Tunney, the Act's sponsor, likewise pointed out why for various reasons the Department of Justice could often not be relied upon to do an adequate job. 119 Cong.Rec. 24598, 3451 (1973).

**98.** *See* Note, *The ITT Dividend: Reform of Department of Justice Consent Decree Procedures,* 73 Col.L.Rev. 594, 603–06 (1973).

**99.** In a meeting at the Greenbrier resort, the Attorney General told AT & T's General Counsel that he wanted to "get rid" of the antitrust case, and that AT & T should be able "readily [to] find practices that [it] might agree to have enjoined with no real injury to [its] business." Report of Antitrust Subcommittee of House Committee on the Judiciary at 53, 86th Cong., 1st Sess. January 30, 1959 (Committee Print).

*See* 552 F.Supp. at 136–37, including notes 8 through 14.

the court having jurisdiction over the lawsuit found them to be in the public interest.

 The Court of Appeals stated in its remand opinion in this case that this Court is required to defer to the Department of Justice on the issue of whether the proposed modification of the decree is in the public interest as that term is used in the Tunney Act.[100] It is the Department which is to weigh the various considerations, the Court being neither required nor permitted to determine whether the resulting array of rights and liabilities is the one that will best serve society. 900 F.2d at 309.[101] More specifically, the appellate court instructed this Court in broad terms to "seriously consider" the Department's judgment on issues "of economic analysis," on "predictions of market behavior," 900 F.2d at 297,[102] and on the effectiveness of FCC regulations, 900 F.2d at 298,[103] the basis therefor[104] being that the Department

might be expected to be more expert than the Court in these fields.[105] 900 F.2d at 298.

In light of these appellate directions, the Regional Companies are drawing reasonable conclusions when they assert that, "unless the relief requested by the Department is plainly outside the bounds of rational policy choice, the Department's motion must be granted, whether or not the District Court believes that the Department is making a mistake;"[106] when they state that the Court of Appeals "has directed this Court simply to determine whether the Department's judgment [that removal of the information services restriction is now in order] is within 'the zone of settlements consonant with the public interest today;'"[107] and when they contend that "[i]n view of the substantial deference that is due to the Department of Justice in this field of economic prediction and inexact science, no amount of discovery or trial

**100.** 900 F.2d at 295.

**101.** The Court of Appeals stated in this connection that District Courts were to decide only whether the settlement is within the reaches of the public interest. 900 F.2d at 309.

**102.** In this respect, the Court of Appeals relied in part upon the assumption that this Court *required* the Department to report to the Court every three years concerning the need for the restriction. 900 F.2d at 297. That assumption is mistaken. The Department of Justice volunteered to provide such reports; they were never required. 552 F.Supp. at 195.

**103.** Elsewhere, the Court of Appeals again emphasized that on the issue of the efficacy of the FCC regulations the Department of Justice's assessment is entitled to significant weight, and it went on to affirm various conclusions reached by this Court on the basis that the Department agreed with this Court and there was no reason to doubt the assessments made thereon by the *Department of Justice.* 900 F.2d at 309. Similarly in *postponing* judgment on the efficacy of FCC regulations, the Court of Appeals said that it thought it "more prudent to await *the DOJ's* assessment in subsequent Triennial Reviews." 900 F.2d at 298 (emphasis added).

**104.** The Court of Appeals further relied on the conclusion that it was an "institutional anomaly" for a District Court to evaluate the effectiveness of an agency's regulatory program, but that there was no such anomaly when the Department of Justice conducts such an evaluation. 900 F.2d at 298. Courts pass on and otherwise

evaluate federal agency programs in a great variety of situations; indeed a substantial proportion of the docket of the Court of Appeals consists of such cases, and they likewise appear with some frequency in the district courts, both here and elsewhere. However, such an evaluation by another Executive department in the course of litigation, particularly litigation concerning a judicial decree, is unusual.

**105.** While a party to litigation may not infrequently be more familiar with the intricacies of particular facts and law than a court, it has never been suggested that this circumstance requires a court to give deference to the conclusions reached by such a party. Even where an agency is charged with the administration of a particular statute, its interpretations and litigating positions are not entitled to judicial deference if such positions, as here, are "unsupported by regulations, rulings, or administrative practice," *Georgetown University Hospital v. Sullivan,* 934 F.2d 1280, 1283 n. 3 (D.C.Cir.1991). Here, of course, we are dealing with the interpretation of a judicial decree—not a subject under Department of Justice administration. Moreover, while that Department may have greater expertise than the courts on antitrust matters in general, this is not likely to be true of the law and the facts governing this particular case which has been under the Court's continuous jurisdiction for over a decade.

**106.** Reply Brief at 13.

**107.** Reply Brief at 1 (quoting 900 F.2d at 307) (emphasis omitted).

testimony would permit the Court to upset the Department's reasoned evaluation of the competitive risks and benefits of RBOC entry." [108]

It is in that context that this Court must consider the determinations of the Department of Justice with respect to the subjects on which, under the appellate decision, the Department is entitled to deference.

The Department's principal determinations on these subjects are as follows:

The fact that competitors depend on Regional Company bottleneck facilities is not in itself sufficient to establish a risk of anticompetitive discrimination, particularly because alternatives [109] are available.[110] The risk of discrimination is minimal since adequate legal or regulatory constraints are present.[111] Any selective degradation of service or the grant of priority to the Regional Company's own information service would be difficult to implement, particularly in view of the FCC's ONA and *Computer III* regulations.[112] There is no evidence that the Regional Companies would act in concert so as to discriminate in the information services field.[113] No substantial risk is present that competition would be impaired by Regional Company cross-subsidization because of FCC regulatory oversight and because few facilities and personnel will be ·shared between the Regional Companies' exchange operations and their information services.[114]

It is this Court's conclusion that none of these contentions is supported by credible evidence in the record, and the Court finds instead, for the reasons elaborated on in Parts I through VI above that, should the restriction on information services be removed, the Regional Companies would have the incentive and the ability, notwithstanding regulatory constraints, to engage in anticompetitive acts on a substantial scale. Nevertheless, in view of the strong and hardly routine Court of Appeals admonitions, this Court has no choice but to defer to the current conclusions [115] of the Department of Justice on these issues.

### B. The Issue of Certainty

This determination is strengthened by the appellate emphasis on certainty. The Court of Appeals has ruled that the "appropriate question under section VII [of the decree] is whether the proposed modification would be *certain* to lessen competition in the relevant market," 900 F.2d at 308 (emphasis added), that is, whether Regional Company entry into the information services market would be *certain* to have the effect of raising price or restricting output in that market.

The intervenors point out that the test under traditional Supreme Court and other appellate decisions with respect to antitrust law involves "probabilities, not certainties." [116] *Brown Shoe Co. v. United*

---

**108.** Reply Brief at 86–87.

**109.** Motion at 19–20, 30. The Department concedes, however, that it "cannot conclude at this point that alternative transmission media would in themselves effectively constrain BOC discrimination against most information services providers." Motion at 33.

**110.** Motion at 15, 30. On the other hand, the Department has concluded that the risk of anticompetitive discrimination against information service providers is not substantial, because these providers could reach their customers through various types of indirect connections—a conclusion that seems to be at odds with one noted in note 109, *supra.*

**111.** Motion at 22.

**112.** Motion at 22–27.

**113.** Motion at 29.

**114.** Motion at 33–35.

**115.** As the Court has previously noted, when the decree was drafted, adopted, and implemented, and for several years thereafter, the Department expressed and urged upon the Court views that were precisely the opposite of its current stance on virtually every issue. Nothing occurred at the time of the Department's change in position other than a change in personnel.

**116.** In fact, the Court of Appeals itself speaks of "anticompetitive *risks* associated with lifting the restriction," 900 F.2d at 309 n. 29 (emphasis added), a concept that would appear to be antagonistic to the certainty standard.

Moreover, although the burden of persuasion is normally on the proponent of a motion, and that proponent must make his case by a prepon-

*States,* 370 U.S. 294, 323 n. 39, 82 S.Ct. 1502, 1522 n. 39, 8 L.Ed.2d 510 (1962);[117] *see United States v. General Dynamics Corp.,* 415 U.S. 486, 505, 94 S.Ct. 1186, 1198, 39 L.Ed.2d 530 (1974); *Federal Trade Commission v. Procter & Gamble Co.,* 386 U.S. 568, 577, 87 S.Ct. 1224, 1229, 18 L.Ed.2d 303 (1967); *United States v. Penn–Olin Chemical Co.,* 378 U.S. 158, 171, 84 S.Ct. 1710, 1717, 12 L.Ed.2d 775 (1964); *United States v. Aluminum Co. of America,* 377 U.S. 271, 280, 84 S.Ct. 1283, 1289, 12 L.Ed.2d 314 (1964); *United States v. Baker Hughes, Inc.,* 908 F.2d 981, 984 (D.C.Cir.1990). Indeed, the certainty standard may well be an impossible one; as the Court of Appeals recognized, economic analysis and market predictions are not an exact science (900 F.2d at 297).[118]

While, as discussed above, the evidence persuades this Court that entry of the Regional Companies into the information services market would allow them quickly to dominate that market and to eliminate both competition and the independents which would make that competition possible, the question under the appellate mandate is whether this Court is *certain* that removal of the information services restriction would have such an effect. The answer to that question is in the negative.

> derance of the evidence, the appellate mandate places the burden on those opposing the Regional Company motion, and requires them to prove their position by a standard that exceeds even the beyond-a-reasonable-doubt standard applicable to criminal cases.

**117.** While *Brown Shoe* involved section 7 of the Clayton Act, the Regional Companies themselves have stressed that contains a "closely analogous standard." Joint Brief for Regional Company Appellants at 54 (filed April 17, 1989), No. 87–5388 (D.C.Cir.1990). *See also,* II P. Areeda & D. Turner, *Antitrust Law* para. 304a (1990).

**118.** *See also,* the reference in the Regional Companies' Reply Brief to the "field of economic prediction and inexact science," quoted at p. 329, *supra.*

Even the President's Council of Economic Advisers, the Federal Reserve Board, and individuals and organizations that invest in the stock market have frequently discovered to their dismay that they are wrong: whatever they may hope for, they surely cannot be certain.

## C. Conditions Today

The Court of Appeals opinion is critical of this Court's reliance on the fact that no change had been shown between the conditions that existed in 1982 when the decree was approved and 1987 when this Court issued the "triennial review" decision. 900 F.2d at 308. To remedy that defect, the appellate court held that removal of the restriction would have to be approved if the relevant rights and obligations are within the zone of settlements "consonant with the public interest *today,*" 900 F.2d at 307 (emphasis in original), and further, that the "district court should determine whether removal of the information services restriction as applied to the generation of information would be anticompetitive under *present* market conditions." 900 F.2d at 309 (emphasis in original).[119]

It is not entirely clear how broad the Court of Appeals' direction was intended to be. On the one hand, by ruling out any reliance on the fact that no significant change had occurred since the direct evidence of the local operating companies' anticompetitive acts was presented at trial,[120] the appellate court may have also ruled out consideration of these earlier anticompetitive acts themselves. If there can be no reliance on the lack of change

**119.** Similarly, the appellate court contrasted removals under Section VII of the decree (which, it said, deals with public interest "today") with Section VIII(C) (which concern the question whether the ability to impede competition had changed from the time "when the decree was approved"). 900 F.2d at 307.

**120.** The Court of Appeals said that there was "no record to speak of" in the *AT & T* trial regarding information services, and from this premise it concluded that this Court lacked a factual basis in 1982 for the imposition of the information services restriction (absent the parties' agreement). 900 F.2d at 307. However, this Court noted when it approved that restriction at the Department of Justice's request that this restriction "is necessary for reasons similar to those justifying the restriction on interexchange services...." 552 F.Supp. at 189. And there can be no question but that (1) insofar as the potential for anticompetitive conduct is concerned, the two types of services parallel each other, and (2) there was ample evidence of such conduct with respect to the interexchange market.

between 1982 and 1987, there can logically be no consideration of the situation as it existed in 1982.[121]

On the other hand, it is possible that, as the Department of Justice contends, the Court of Appeals intended to allow this Court to consider both the evidence of anticompetitive acts prior to 1982 and the evidence that has been added to the record since then.[122] But this would still leave the Court with the very difficult task[123] of basing its decision primarily on theoretical predictions[124] of hypothetical market power and hypothetical risks of improper conduct, all of it substantially divorced from the facts for which there is an evidentiary record.

The required focus on predictions on which the various experts are in disagreement thus adds to the weight that must be given to the Justice Department's judgments[125] and it further complicates the search for certainty.

\* \* \* \* \* \*

■ To sum up. It is the Court's judgment that in view of the requirements imposed by the Court of Appeals which are summarized above, it could not responsibly[126] and with proper deference to that

court rule that the information services restriction must be retained. Accordingly, the Court is ordering simultaneously herewith that the restriction shall be removed.

## VIII

### *The Need For A Stay*

■ The Court will, however, stay the effect of its decision pending the completion of appellate review. While, as indicated, this Court is following what appear to be the most plausible interpretations of the several critical Court of Appeals directions, it must be recognized that some of these directions are not necessarily susceptible of but a single interpretation.

For example, the intervenors argue, with some justification, that the "certainty" ruling may constitute a reference to the Court of Appeals' own obligations rather than those of this trial court. One of the Court of Appeals' references to the certainty standard clearly refers to that court's own obligations on appeal.[127] The references to the Department of Justice can likewise have several meanings: while this Court has been directed to give "serious consideration" to the Department's views on eco-

---

**121.** Although a decision today regarding the removal of the information services restriction must be made on the basis of present conditions, it is difficult to do so while ignoring what occurred when the local telephone operating companies last had the opportunity to act in a discriminatory fashion on a significant scale because their bottlenecks on local exchange service gave them an unfair advantage. One way to take account of these events so as to bring them up to date is to inquire whether any material change occurred between then and now.

**122.** Justice Department Reply Brief at 3–4.

**123.** The Court of Appeals recognized that problem, stating that "it may be difficult to decide whether the BOCs would have [market] power if they were allowed to enter a market." 900 F.2d at 296.

**124.** It is somewhat ironic that the Department of Justice complains that its opponents are relying "on economic theory alone," and that it counsels against the use of "economic theory divorced from the facts." Reply Brief at 15. The truth is that it is the Department that wishes to escape from concrete facts—those that emerged during the *AT & T* trial and in the

Tunney Act proceeding—and to rely instead primarily on predictions.

**125.** The Department's judgments would obviously have less weight in the context of tangible evidence such as that of Regional Company anticompetitive conduct prior to 1982.

**126.** The Court has rejected the alternative of construing the appellate opinion in such a way as to permit it to order the retention of the restriction. *See, e.g.,* Part VIII, *infra.* The Court feels obligated to interpret the opinion of the Court of Appeals as that tribunal most plausibly intended it to be interpreted.

**127.** Said the court, "because *we cannot be certain* that these findings were not infected by the court's legal error...." 900 F.2d at 308 (emphasis added). On the other hand, elsewhere the appellate court's discussion of the certainty concept appears to have broader scope than a reference to appellate duties ("the appropriate question under section VII is whether the proposed modification would be certain to lessen competition," 900 F.2d at 308). *See also, United States v. Western Electric Co.,* 907 F.2d 1205, 1209 n. 7 (D.C.Cir.1990).

nomic theory and on the efficacy of FCC regulation, the appellate court did not indicate what weight is to be given to the evidence adduced by other parties, or whether the term "serious consideration" is to be equated with "decisive effect" irrespective of other considerations. And again, as alluded to above, it may be that, in emphasizing that this Court was to make its findings with respect to current conditions, the Court of Appeals did not intend to rule out substantial consideration of the experience with anticompetitive conduct of the local telephone companies as revealed by the pre–1984 record.

For these reasons, while this Court is not prepared to depart from what appears to be the most plausible reading of the directions of the Court of Appeals (*see* notes 95 and 126, *supra*), and it therefore holds in favor of the Regional Companies, it cannot be certain that its interpretation of the dispositive appellate directions is correct. It follows, of course, that this Court cannot be certain of the correctness of its decision to remove the information services restriction from the decree.

Yet if the Regional Companies were to enter the information services market while the critical issues are still as unsettled as they may well be, substantial funds could be spent in reliance on a decision which could subsequently be vacated, and corporate changes could take place on a like reliance both within the Regional Companies and by others now engaged in one or more of the many facets of the information services. It is appropriate, therefore, to stay the effects of this Court's current ruling until finality has been reached in the appellate process,[128] and the Court will do so.

---

**128.** The stay is entered on the assumption that one or more of the parties or intervenors will appeal, as has been the recent experience. Should appeals not be filed, the stay will of course be dissolved.